**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **CADENCE BANK AND LINSCOMB WEALTH f/k/a LINSCOMB & WILLIAMS, INC.,** | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO: 5:24-cv-00256-FB-RBF** |
| **PRECEDENT WEALTH PARTNERS, LLC, JOSEPH HAROLD WILLIAMS, AND GEORGE WILLIAMS,** | § § § § | |
| **Defendants.** | § § § | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
PARTIAL MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Cadence Bank and Linscomb Wealth f/k/a Linscomb & Williams, Inc. file this Reply in support of their Partial Motion for Summary Judgment (Doc. 88) (the "Motion").

<u>**ARGUMENT AND AUTHORITIES**</u>

**A.    Harold and George Breached Their Fiduciary Duties.**

The Williams Brothers engaged in objectively disloyal conduct during the nine-month period leading up to their immediate resignations without notice, breaching the fiduciary duties they owed to Plaintiffs.  Motion at 32-34.  They attempt to excuse their disloyal conduct by relying on cases that are not only distinguishable and inapplicable but also reached an unfavorable result for Defendants with respect to breach of fiduciary duty findings.  Doc. 97 (the "Response") at 21.

The Williams Brothers would have the Court believe "they merely prepared to compete," which they claim is permissible.  But the cases addressing the preparing-to-compete doctrine upon which Defendants rely focus exclusively on at-will employees—not high-ranking executive-level employees with employment agreements requiring resignation notice like the Williams Brothers— *i.e.*, employees who are decidedly ***not*** at will.  *See id*.; Doc. 88-3 § 5(e) ("Notice of Termination"); *see Johnson v. Brewer & Pritchard*, P.C., 73 S.W.3d 193, 201 (Tex. 2002) (analyzing the preparing-to-compete doctrine with an ***at-will employee***); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 284 (5th Cir. 2007) (citing *Johnson* and noting only that, "[u]nder Texas law, ***an at-will employee*** 'may properly plan to go into competition with his employer and may take active steps to do so while still employed.'" (emphasis added)).  As chairman and managing director, bound by employment contracts refuting any at-will employee status, neither Harold nor George was free to "plan" to compete, let alone actually compete, which is precisely what they did.  The fiduciary duties owed as a result of their positions required more.  *See, e.g.*, *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963) ("The duties of officers and directors . . . include an ***extreme measure*** of candor, unselfishness, and good faith.") (emphasis added); *Int'l*

*General Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995, writ denied) ("…in Texas, it is well established that officers of a corporation, by virtue of their authority, privileges and trust, have a strict fiduciary obligation to their corporation.").[1]

Even if the preparing-to-compete cases apply, which they do not, Defendants did far more than just plan. Like the lead defecting employee in *Navigant*, where the court found a breach of fiduciary duty, the Williams Brothers engaged in multiple improper acts. *See Navigant*, 508 F.3d at 281, 284. Harold coordinated a disruptive exit for himself and two other Linscomb employees. Doc. 88-12 at 46:25-48:3 (Grant "march[ing] to [his] dad's drum on it."). Harold led the transition strategy and communicated it to George, Grant, and executives at Dynasty. *Id*. at 85:9-17 (Grant testifying, ". . . Harold led the efforts[.]"). Harold accessed company data while a hard drive was connected to his Linscomb computer. Motion at 12-13. While employed by Linscomb, the Williams Brothers traveled for a meeting with Dynasty (a competitor company) to pitch for backing to found Precedent and transition clients from Linscomb. *Id*. at 7. The Williams Brothers went beyond what the employees in *Navigant* did by interviewing and hiring multiple employees and an independent contractor in connection with running Precedent, to compete directly against Linscomb, all while employed by Linscomb. *Id*. at 11. Given the similarities, and indeed the more significant steps taken by employees who are ***not at-will*** (unlike those in *Navigant*) evidencing actual competition, Defendants should suffer the same fate as the *Navigant* employees—a breach of fiduciary duty finding, at the summary judgment stage.

Attempting to further downplay their disloyal conduct, Defendants contend Plaintiffs'

---

[1] Oddly, Defendants support their arguments with *Navigant* and *Johnson*, two cases that favor Plaintiffs. In *Navigant*, the Fifth Circuit affirmed the jury's verdict that two former at-will employees breached their fiduciary duties to their former employer where they failed to disclose to their employer their improper plan to compete, disclosed their employer's confidential information in furtherance of that plan, and solicited other employees to a competitor. *Navigant*, 508 F. 3d at 290. In *Johnson*, the Texas Supreme Court found that an at-will employee in fact owed certain fiduciary duties to his employer and reversed and remanded the trial court's grant of summary judgment in favor of the employee on a breach of fiduciary duty claim. *Johnson*, 73 S.W.3d at 202.

fiduciary duty claim fails because they did not misappropriate "any" trade secrets or solicit "any" clients. Response at 19. This contention is unsupported by the record and refuted below. *Infra* at §§ C, E(2). While Plaintiffs' fiduciary duty claim is not based on Defendants' trade secret misappropriation, the competent summary judgment evidence shows George in fact ***used*** the client check-in list to communicate with multiple clients before leaving Linscomb. Motion at 11-12 (referencing notes George made on the check-in list while still employed). Whether George affirmatively solicited these clients, or simply reached out to keep these clients "warm" in connection with his transition to Precedent, there can be no genuine dispute George's conduct was intended primarily to benefit himself, his brother, and Precedent, in breach of the duties he owed Linscomb. *See Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied) ("The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation."); *see also Navigant*, 508 F.3d at 283 (noting a fiduciary "has a duty to act primarily for the benefit of the employer in matters connected with his agency.") (citation omitted).

Finally, Defendants contend Plaintiffs' fiduciary duty claim somehow fails at the summary judgment stage because Harold never "incited" George or Grant. Rather, they "independently decided to follow Harold." Response at 19. Defendants' contention is at once irrelevant and unsupported by the record. In light of all the other breaches of their fiduciary duties, Defendants do not also need to prove that Harold incited other employees to leave (although he did) to prevail on this claim. Motion at 33-34. The summary judgment evidence shows Grant and George made their purported "independent" decision to follow Harold only after Harold grew unhappy with his employment at Linscomb, after Harold decided he would leave Linscomb and start a competing firm, after Harold told Grant and George he planned on starting a competing firm, and after George

understood that Harold "wanted [George] and Grant Williams to be part of this firm that he was planning to create." Motion at 5-6. Critically, at no point did Harold inform Linscomb of his intent to start a competing firm or of his communications with George and Grant about that competing firm. These are independent breaches of Harold's fiduciary duties. *Id*. at 33-34. There can be no genuine dispute that Harold's conduct was intended primarily to benefit himself, his brother, and Precedent, but not Linscomb—precisely the opposite interests he had fiduciary duties to protect. *See Loy*, 128 S.W.3d at 407; *Navigant*, 508 F.3d at 283.

**B.      The Williams Brothers Breached Their Notice of Resignation Provisions.**

There can be no dispute the Williams Brothers resigned effective immediately, without notice, and in breach of the notice provisions in their Employment Agreements. *See* Motion at 24-25. Defendants do not contend otherwise. *See* Response at 9-10. Instead, they argue only Harold (but not George), is somehow excused from his breach because Harold's job responsibilities changed without an alleged prerequisite writing.[2] *See id*. at 10. In advancing this argument Defendants fail entirely to offer any competent summary judgment evidence supporting the remedy of "excuse." *See Hanks v. GAB Bus. Servs. Inc.*, 644 S.W.2d 707, 708 (Tex. 1982). Specifically, Defendants do not identify any provision of the Employment Agreement, testimony from the parties, or other competent summary judgment evidence suggesting Harold's obligation to provide notice of his resignation was ***dependent*** upon Linscomb's obligation to modify Harold's responsibilities in writing. Indeed, it was not. *See Hanks*, 644 S.W.2d at 708 (Tex. 1982) ("A prerequisite to the remedy of excuse of performance is that covenants in a contract must be mutually dependent promises."). Defendants have no evidence establishing Harold opposed Linscomb's alleged initial breach, as required by law. *See id*. ("A party who elects to treat a

---

[2] Defendants further argue Plaintiffs failed to show that any breach caused damages. Response at 9. This argument is addressed and resolved in Plaintiffs favor as set below. *Infra* at § D.

contract as continuing deprives himself of any excuse for ceasing performance on his own part."). Instead, he simply elected to treat his employment relationship as continuing despite Linscomb's alleged breach.

Defendants also illogically contend Plaintiffs waived their notice of resignation claim by failing to brief the issue in response to Defendants' Summary Judgment Motion. *See* Response at 9, citing *Arias v. Wells Fargo Bank*, N.A., No. 3:18-CV-00418-L, 2019 WL 2770160, at *2 (N.D. Tex. July 2, 2019). This is false for two reasons. First, Plaintiffs clearly reference the notice of resignation facts in their corrected response to Defendants' Summary Judgment Motion. Doc. 85 ("Plaintiffs' Response") at 6-7. Second, and more importantly, Plaintiffs ***affirmatively move for summary judgment on their notice of resignation claim***, citing evidence establishing the Williams Brothers resigned effective immediately and without notice. Motion at 13. Defendants' reliance on *Arias*, a case where the plaintiff simply failed to respond at all to an argument on summary judgment and therefore "failed to defend [the] claim," has absolutely no relevance here. *Arias*, 2019 WL 2770160 at *2. Even the *Arias* court, which addressed completely inapposite facts, acknowledges courts must consider the record "taken as a whole" when determining whether there exists a genuine dispute for trial. *Id*. The record here establishes no waiver.

Because Defendants have no argument in response to George's breach of the notice provision, and because their excuse argument with respect to Harold's breach is wholly unsupported by the facts or the law, summary judgment against both Williams Brothers is required on Plaintiffs' claim alleging breach of the notice provision.

### C.    Defendants Misappropriated Plaintiffs' Trade Secrets.

#### 1.    The compilations of client-related information in the quarterly wealth advisory reports and check-in list are trade secrets.

Plaintiffs identify as trade secrets the compilations of client-related information (*e.g.*,

identities, contact information, values of managed assets, etc.) in George's client check-in list and the quarterly advisory reports Defendants misappropriated. Motion at 20-21. While Plaintiffs became aware of George's misappropriation early in this litigation, Plaintiffs first learned about the Williams Brothers' misappropriation of the information in the quarterly advisory reports during Harold's deposition. Doc. 88-4 at 126:22-24 (testifying the GFW Book Analysis "would have been generated by looking at a report provided to George on his book of business"). Defendants fail to cite any case supporting their contention that a trade secret misappropriation claim fails when the plaintiff uncovers the precise manner of the misappropriation for the first time during the defendant's deposition. Logic and the law dictate otherwise. *See Total Quality Logistics, LLC v. Medellin*, No. SA-23-CV-00333-XR, 2023 WL 7289396, at \*6 (W.D. Tex. Nov. 2, 2023) (requiring a trade secret plaintiff to show only ownership, misappropriation, and injury).

With no evidentiary support, Defendants contend Plaintiffs failed to restrict access to confidential information or implement policies or procedures safeguarding it from disclosure and allowed employees to keep such information on their personal devices. Response at 3. Defendants' unsubstantiated assertions are undermined by the uncontroverted summary judgment evidence establishing Plaintiffs took reasonable steps to keep sensitive client-related information secret, including the client check-in list and the quarterly reports, through confidentiality agreements, employment agreements, policies, password protected computers and databases, and other computer safeguards. Doc. 88-6 at 29:1-30:17; *see TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").

Defendants next contend Plaintiffs' description of the client information in the client

check-in list and the quarterly advisory reports is too insufficient and vague to qualify for trade secret protection.  Response at 4.  There is nothing "insufficient or vague" about the client check-ins and GFW Book Analysis that Plaintiffs have not only described but provided to the Court. Defendants' reliance on *StoneEagle* to bolster their unfounded "insufficient and vague" arguments is misplaced; this case does not even suggest that a detailed description of two separate compilations of client information, accompanied by the underlying documents themselves, as present here, is too vague to be worthy of trade secret protection.  *See id*.  Rather, *StoneEagle* concerns a plaintiff's failure to identify at all, let alone with reasonable particularity, the information upon which the plaintiff based its trade secret claims ***during discovery***.  *StoneEagle Services, Inc. v. Valentine*, No. 3:12-CV-1687-P, 2013 WL 9554563, at *1 (N.D. Tex. June 5, 2013).  By contrast, the client check-in list and the GFW Book Analysis were sufficiently described, provided to the Court, and collectively detail the exact compilations of client-related information Defendants used to found Precedent. Defendants fail to create a genuine fact issue regarding whether such information is the type of client-related information protected by TUTSA and DTSA.  *See, e.g.*, *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 909, 916 (S.D. Tex. 2015) ("Items such as customer lists, pricing information, client information, customer preferences, and buyer contacts may be trade secrets if they meet the criteria for such.").

>    **2.      The Williams Brothers used the compilations of information in the quarterly wealth advisory reports and check-in lists to found Precedent.**

Defendants contend there is no evidence that the Williams Brothers "***used***" Plaintiffs' trade secrets, rendering Plaintiffs' theories of use "speculative."  Response at 5-7.  Even if Plaintiffs' witnesses lack first-hand knowledge of the Williams Brothers' insidious misappropriation as Defendants contend, the competent summary judgment evidence establishes use.  First, in the months leading to the Williams Brothers' immediate resignations, George used the client check-

in list to call his Linscomb clients, many of whom (including ████████ and ███████)
transitioned their assets to Precedent.  Motion at 11-12 (highlighting relevant testimony and
attaching the check-in list, reflecting, among other things, George's outreach to ██████ and an
annotation stating: "spoke recently").  Second, in preparing modeling assumptions for Precedent
to receive Dynasty's backing, the Williams Brothers, with Grant, created the GFW Book Analysis
by "looking at a report provided to George on his book of business," also known as using
Linscomb's non-public wealth advisory reports.  Doc. 88-4 at 126:22-24; Doc. 88-1 at 95:2-96:8.
Based on the Williams Brothers' testimony and documentary evidence before this Court, there can
be no genuine dispute over whether the Williams Brothers used Plaintiffs' trade secrets.

> **3.      Defendants willfully and maliciously misappropriated trade secrets.**

Defendants consciously disregarded many duties they owed Plaintiffs, including their duty
not to misappropriate trade secrets.  Attempting to minimize their willful and malicious conduct,
Defendants contend Harold's communications with Linscomb's attorney about a "White Knight"
investor, and his stated concerns about whether such communications breached his fiduciary
obligations, did not concern Precedent.  Response at 7.  At best, Defendants' contention about the
White Knight investor is inapposite to whether Defendants willfully and maliciously
misappropriated Plaintiffs' trade secrets.  Defendants' misappropriation of the information in the
GFW Book Analysis and client check-in list was part of a comprehensive corporate Blitzkrieg that
was intended to "increase the likelihood that their clients would follow them to Precedent."  Doc.
88-14 at 90:8-19.  It was part of a collective and conscious disregard for Plaintiffs' rights—and
Defendants fail to show otherwise.  *See, e.g.*, *Snowhite Textile & Furnishings, Inc. v. Innvision
Hosp., Inc.*, No. 05-18-01447-CV, 2020 WL 7332677, at *13 (Tex. App.—Dallas Dec. 14, 2020,
no pet.) (affirming a finding of willful and malicious misappropriation where, among other things,
the defendant encouraged the plaintiff's employees "to participate in covert, comprehensive

copying of [the plaintiff]'s documents").

## D.    The Williams Brothers Breached Their Nondisclosure Covenants.

Defendants' challenges to Plaintiffs' nondisclosure claim fail to defeat summary judgment. While Defendants contend Plaintiffs' nondisclosure claim is preempted by TUTSA, TUTSA's preemption provision "does not affect . . . contractual remedies[,]" (*see* Tex. Civ. Prac. & Rem. Code § 134A.007(b)(1)), and Defendants fail to cite any case suggesting it does.  *See* Response at 8.  Despite Defendants' brazen contention that Plaintiffs cite no evidence the Williams Brothers actually used their confidential information, the Williams Brothers used the client check-in list and the quarterly advisory reports to found Precedent, as addressed above.  *See* Response at 8-9; *infra* at § C(2).  Finally, although Defendants argue Plaintiffs do not submit a damage model or identify damages calculations, Linscomb established it has been harmed to the tune of approximately $487 million in AUM.  *Id*.; Motion at 15 (detailing the transitioning of nearly 100 Linscomb clients); Doc. 88-5 at 103:20-104:6.  For months, the Williams Trio, alongside Jay Aldis and Dynasty, carefully crafted a plan contemplating multiple express breaches of covenants to maximize the likelihood of a singular mass transition of assets from Linscomb to Precedent—and they effectuated that plan.  Defendants cannot escape liability by arguing this mass transition of assets was caused by one contractual breach rather than another singular breach, a compilation of certain other breaches, or a compilation of all other breaches.  *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938) ("A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages.").[3]

---

[3] Defendants further argue that Plaintiffs waived this claim as well.  Because Plaintiffs likewise moved for affirmative summary judgment on this claim and addressed it in response to Defendants' Motion for Summary Judgment, the waiver arguments set forth above (*supra* at § D) defeat any waiver claim.  Motion at 24; Plaintiffs' Response at 8-9.

**E.      The Williams Brothers Breached Their Client Nonsolicitation Covenants.**

**1.      Plaintiffs' client nonsolicitation covenants are enforceable.**

Defendants contend the client nonsolicitation covenants are unenforceable because such covenants "must contain reasonable geographic limitations." Response at 10-12. That is not the law. *See, e.g.*, *Alex Sheshunoff Mgmt. Services, L.P. v. Johnson*, 209 S.W.3d 644, 656-57 (Tex. 2006) (finding a geographically unbounded nonsolicitation covenant enforceable); *see also Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 654 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (explaining a customer-based covenant not to compete is a reasonable alternative to a geographically limited covenant not to compete). Nor do the cases upon which Defendants rely suggest that is the law. *See, e.g.*, *Pittsburgh Logistics Sys., Inc. v. Barricks*, 2022 WL 705870, *6 (S.D. Tex. Mar. 9, 2022) (making no mention of any geographic requirement for nonsolicitation covenants); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 686 (S.D. Tex. 2014) (same). And while courts have enforced client nonsolicitation covenants that expressly list the prohibited clients, Plaintiffs are unaware of any case, and Defendants have cited none, that held a client nonsolicitation covenant must list the prohibited client to comply with Section 15.50 *et seq*. *See, e.g.*, *GE Betz*, 301 F.Supp. 3d at 686 (merely noting that "[c]ourts . . . have upheld restrictive covenants without geographic restrictions when the plaintiff provides a precise list of customers covered under the agreement").

The test for enforceability is one of reasonableness and necessity. Defendants fail entirely to show that Plaintiffs' client nonsolicitation covenants are broader than necessary to protect Plaintiffs' legitimate business interests, are unreasonable, and are thus enforceable.

**2.      Defendants induced clients to transition assets away from Linscomb.**

There can be no genuine dispute that Defendants induced and otherwise solicited Linscomb clients to transition their assets to Precedent. In response, Defendants contend that, because certain

10

clients initiated contact with them, there is at least a genuine issue of fact for the jury to decide whether Defendants induced Linscomb clients to transition their assets to Precedent in breach of Defendants' nonsolicitation covenants.  Response at 12-14.  But Defendants fail to cite a single case supporting their position that, once a client contacts a departing employee, that departing employee is then free to induce or otherwise solicit the outreaching client.  *See id*.  And Defendants further fail to cite any case supporting their position that a departing employee may carefully coordinate a departure that would prompt clients to reach out and then induce or otherwise solicit those clients once they do.  *See id*.

The Williams Brothers no doubt carefully coordinated their departure to "surprise" clients and to prompt those clients to reach out after their immediate resignations—to increase the likelihood that they could induce such clients to transition their assets.  In the "Email Protocol" the Williams Brothers drafted weeks before their separation, Defendants promise to set up a future time to meet with clients, to give a canned sales pitch related to their business, and to then hold a question-and-answer session.  Doc. 97-12 at 1; *see also* Doc. 97-11; *see also* Motion at 27-28.  Defendants have no evidence any client transitioned their business to Precedent, or even asked to, before Defendants delivered the promised sales pitch and held the question-and-answer session.

Defendants operated under the misguided impression that once a client initiates contact, no further conduct on their part could constitute an impermissible solicitation or inducement.  This impression is not supported by the law or by the governing agreements.  Indeed, according to the plain language of the agreements, the question is not who initiated the first contact but whether the Williams Brothers engaged in conduct that constitutes an impermissible inducement or solicitation directed towards Linscomb's clients.  The Williams Brothers engaged in such conduct.  *See, e.g.*, Doc. 88-1 at 236:6-13 (George admitting that "every time [they]'re interacting with a client, for

11

the purposes of talking to them about Precedent or providing them with wealth advice, that's to gain their business[.]").

Despite the evidence, Defendants contend their communications with clients did not amount to impermissible solicitations or inducements, citing *Sunbelt Rentals, Inc. v. Holley*, No. 3:21-CV-3241-N, 2022 WL 1049468, at *5 (N.D. Tex. Apr. 7, 2022). Response at 14. But the conduct in *Sunbelt* only highlights the extent to which Defendants breached their nonsolicitation covenants. There, the departing employee testified he called the at-issue customers to inform them who would be handling their accounts and refused to identify his new employer. *Id.* at *5. The contrast could not be starker. Unlike the Williams Brothers here, the departing employee in *Sunbelt* did not develop subsequent communications to address the customers' business, much less a sales pitch. *See id.* Unlike the Williams Brothers, the departing employee in *Sunbelt* neither planned nor executed on a sales strategy intended to receive customer inquiries, address such customers' inquiries, and transition such customers' business. *See id.*[4]

Here, months before their immediate resignations, the Williams Brothers planned to speak with their clients about their business, and to answer questions, all with the very real and very obvious goal "to gain their business." Doc. 88-1 at 236:6-13. They then acted on that goal and had conversations with undecided Linscomb clients. As a result of these conversations, as well as the breaches of other obligations owed, clients worth approximately $487 million in AUM

---

[4] The Williams Brothers' conduct is much closer to the conduct of the departing employees in *Hernandez*. *See Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *14 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied). In *Hernandez*, two employees departed along with several members of the servicing team. Within months, hundreds of policyholders previously sold to and serviced by that team canceled their policies. *See id.* at *2-*4, *14. Like the Williams Brothers, prior to departing, the defendant-employees drafted a document for clients to sign, attesting that "the decision to cancel the policy was the policyholder's own choice and that the policyholder had not been told to cancel the policy." *Id.* at *14. The *Hernandez* court affirmed the lower court's grant of a temporary injunction based on this evidence and evidence of employee solicitation efforts that the Court found "were much more than passively answering questions." *See id.*

transitioned their business from Linscomb to Precedent. Doc. 88-13 at 65:21-66:1, 71:4-7. This conduct constitutes a breach of the nonsolicitation covenants as a matter of law.

**F.     Harold Breached the Nonprocurement Provisions of his LTEIP Agreement.**

Harold's 2022 LTEIP includes a nonprocurement covenant that prohibits Harold, during his employment and for one year after, from directly or indirectly "***procuring***, soliciting, or aiding another in the ***procurement*** or solicitation of any of the customers or financial services business of Cadence or its Affiliates[.]" Doc. 88-10 at § 8(b). Defendants reassert their arguments that Harold's LTEIP restrictions are unenforceable for lack of consideration and geographic restrictions. Response at 22. These arguments fail for the reasons discussed in Plaintiffs' Response and the Motion. Motion at 29-30; Plaintiffs' Response at 13, 15-16.

Defendants also contend Harold did not violate the nonprocurement provision of his LTEIP because his "acceptance" of restricted business does not constitute "procuring" that business. Response at 22. They argue one may *accept* business passively, but ***procurement*** requires "particular care and effort." *Id*. But neither Defendants' definitions, nor the context of the nonprocurement provisions in the Employment Agreements support Defendants' reading. Defendants quote a pair of definitions in the Merriam Webster dictionary—"to get possession of (something): to obtain (something) by particular care and effort"—only the secondary of which requires particular care and effort. *See* Response at 22. Similarly, the Black's Law Dictionary definition Defendants cite (but do not quote) defines "procure" as "[t]o obtain (something), ***esp.*** by special effort or means." (emphasis added) Black's Law Dictionary (12th ed. 2024). Moreover, the text of the provision fails to support the narrow construction advanced by Defendants. The provision prohibits both "procuring" and "soliciting," but Defendants' proposed construction conflates the terms, rendering one superfluous. Such a construction should be rejected in favor of Plaintiffs' construction, which preserves meaning for both terms. *U.S. Metals, Inc. v. Liberty Mut.*

13

*Group, Inc.*, 490 S.W.3d 20, 23–24 (Tex. 2015) ("An interpretation that gives each word meaning is preferable to one that renders one surplusage.").

Even if ***procurement*** is construed to require "particular care and effort," Harold planned to and did far more than passively accept Linscomb's clients. Specifically, Defendants' "protocol," which contained both a sample email to clients offering to engage in further communication about Precedent and talking points to be used in such conversations, demonstrates particular care and effort. *See* Doc. 88-24 at Exs. A-C. And despite Defendants' protests that the protocol Plaintiffs identified was not identical to the one actually implemented, Response at 13, the "protocol" emails Defendants eventually sent to Linscomb's clients indeed offered to have further conversations regarding Precedent and invited clients to make their own comparisons to the offerings of Linscomb. *Compare* Doc. 88-24 at Ex. A with, *e.g.*, Doc. 97-12; *see also* Ex. 11, *passim*. Both sending the protocol emails and actually engaging in the promised conversations no doubt constitute "particular care and effort," and there is no evidence a single client transferred its business prior to engaging in these processes.

Defendants somehow dispute they procured the business of even the four clients Plaintiffs identified by insisting the client may have initiated the contact in each case. *See* Response at 23. But that distinction is immaterial. Defendants cite no authority establishing that a non-procurement covenant cannot prevent procurement of clients if the clients initiate contact. Nor have Defendants identified anything within the terms of the agreements that limits the restriction to non-client-initiated contact. Plaintiffs are entitled to summary judgment on Harold's procurement of clients in breach of the non-procurement covenant in his 2022 LTEIP Agreement.

## G.    Harold and George Breached Their Non-Competition Covenants.

The Williams Brothers contend Plaintiffs' noncompete claim fails because the covenant is

14

overbroad and there is no evidence of damages.  Response at 23-25.  To the extent Defendants'

overbreadth argument recycles arguments from their Summary Judgment Motion, Plaintiffs refer

the Court to Plaintiffs' Response at 10-12.  And to the extent Defendants' damages argument

purports to require Plaintiffs to apportion damages to prevail on their noncompete claim, Plaintiffs

refer the Court to Section D, *supra*, citing *Sw. Battery Corp.*, 115 S.W.2d at 1099.

Plaintiffs' reliance on *Steel Dust Recycling, LLC v. Robinson* also fails to defeat summary

judgment on Plaintiffs' noncompete claim.  Response at 24.  In *Steel Dust*, the jury found the

plaintiffs did not suffer damages as a result of any proven breach, and the plaintiffs argued that,

under the Covenants Not to Compete Act, "the Court is required to award Plaintiffs some sort of

relief[.]" *Steel Dust*, No. 4:19-CV-02818, 2024 WL 4252813, at *8 (S.D. Tex. Aug. 15, 2024).

Plaintiffs make no such argument here—nor is there any need.  The Williams Trio deliberately

contemplated multiple express breaches of covenants to maximize the likelihood of a singular

mass transition of assets from Linscomb to Precedent—and then effectuated that plan.  Motion at

10-14.  The result was nearly 100 Linscomb clients moving hundreds of millions in assets under

management from Linscomb to Precedent.  *Id*. at 15.

Defendants cannot genuinely dispute that the Williams Brothers' competitive conduct,

both before and after their resignations, breached the noncompetition covenants and contributed

to the substantial financial harm that Linscomb suffered.  Summary judgment is appropriate.

## **CONCLUSION**

For all the reasons put forth, Plaintiffs respectfully request that the Court grant their Partial

Motion for Summary Judgment.

Dated:  March 18, 2026

**MORGAN, LEWIS & BOCKIUS LLP**

By */s/ Michael P. Jones*
**Stefanie R. Moll**
State Bar No. 24002870
stefanie.moll@morganlewis.com
**Michael P. Jones**
State Bar No. 24072174
michael.jones@morganlewis.com
**John P. Bramble**
State Bar No. 24101544
john.bramble@morganlewis.com
**Robert A. Ehrlich**
State Bar No. 24116318
robert.ehrlich@morganlewis.com
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T:  713.890.5780
F:  713.890.5001

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that on March 18, 2026, I served all counsel of record by electronically filing the foregoing with the Clerk of Court using the CM/ECF system.

*/s/ Michael Jones*
Michael Jones

16